UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
GHOST IN THE MACHINE INC., d/b/a          :
SNAKE NATION,                                          :
                                                        :
                              Plaintiff,      :              22-CV-9270 (VSB)
                                                        :
              - against -                     :              **OPINION & ORDER**
                                                        :
PLANNED PARENTHOOD FEDERATION   :
OF AMERICA, INC. and PLANNED        :
PARENTHOOD GLOBAL, INC.,              :
                                                        :
                              Defendants.   :
                                                        :
------------------------------------------------------------X

Appearances:

Craig Laurence Dashiell
Lowenstein Sandler LLP
Roseland, NJ
*Counsel for Plaintiff*

Richard Alan Roth
Brian Seth Levenson
The Roth Law Firm, PLLC
New York, NY
*Counsel for Defendants*

VERNON S. BRODERICK, United States District Judge:

        Plaintiff Ghost in the Machine Inc., doing business as Snake Nation ("Snake Nation")

worked with Defendants Planned Parenthood Federation of America, Inc. ("PPFA") and Planned

Parenthood Global, Inc. ("PPG") on a social media campaign in Africa.  During the pilot phase

of the project, Defendants terminated the contractual relationship meant to govern the campaign.

Plaintiff then brought this action, alleging contract, quasi-contract, and business-tort claims

against Defendants related to the termination of the contract and subsequent fallout.  Defendants

move to dismiss Plaintiff's claims, except for Plaintiff's breach-of-contract claim against Defendant PPG. For the reason that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.      Factual Background[1]

Plaintiff Snake Nation is a media company with offices in the United States and South Africa "that focuses on engaging young people to developing digital marketing campaigns as a way of creating social impact and work in the creative economy." (Doc. 1 ("Compl.") ¶ 14.) On September 1, 2017, Snake Nation and PPG entered into a Master Services Agreement ("MSA") for Snake Nation to provide social media consulting services to PPG. (*Id.* ¶ 16; Doc. 11-1 ("MSA") ¶ 1.a.) Defendant PPG is a separately incorporated, wholly owned subsidiary of Defendant PPFA. (Compl. ¶ 9.)

"[A]t PPFA's invitation, Snake Nation scoped and then proposed launching a wellness campaign to promote sexual and reproductive health in West Africa." (Compl. ¶ 15.) Snake Nation would recruit West African teens and young adults called "Billis" to promote the campaign. (*Id.* ¶ 17.) The parties hoped that the campaign promoters would gain "transferrable skills in digital media creation that could be used to obtain later employment." (*Id.*) The structure of the MSA contemplated that for each project within the scope of the MSA, the parties would execute a Statement of Work, which would outline the services that Snake Nation would provide and the terms of PPG's payments for those services. (MSA ¶ 1.b.) The MSA included a term that PPG would have 30 days to dispute any invoices that Snake Nation submitted in connection with a Statement of Work, that the parties would "work in good faith to resolve any

---

[1] The following factual background is drawn from Plaintiff's complaint, (Doc. 1 ("Compl.")), and documents incorporated within or integral to the complaint, (Doc. 11-1 ("MSA"); Doc. 11-2 (Youth Engagement Project Statement of Work ("SOW No. 3")); Doc. 11-3 (Amendment ("Amend. SOW No. 3" or "Amended Statement of Work")). My recitation of these facts does not constitute factual findings and should not be construed as such.

billing disputes within 60 days" of notification of the dispute, and that "[a]ll undisputed fees shall remain due and owing."  (*Id*. ¶ 3.c.)

Prior to starting work on the social media campaign, Snake Nation, PPG, and PPFA executed SOW No. 3 in July 2018.  (Compl. ¶ 19.)  Pursuant to this agreement, Snake Nation would begin a nine-month pilot of the campaign in Burkina Faso.  (*See* SOW No. 3.)  "The end objective of the completed pilot [was] to have a model of youth engagement that has been proven to be effective in moving adolescents and youth towards adoption of healthy SRH [sexual and reproductive health] behaviors."  (*Id*. at 2.)  Over the course of the pilot, Snake Nation would, among other things, recruit staff, begin operations in Burkina Faso, develop social media campaign content relevant to the country, engage with the Billis to promote the campaign, and evaluate the performance of the content and overall campaign.  (*Id*. at 2; *see also* Compl. ¶¶ 19–20.)  In exchange for this work, SOW No. 3 states that PPG would pay Snake Nation $2,005,067 for its services.  (SOW No. 3 at 4, 10; Compl. ¶ 21.)  Snake Nation budgeted for additional reimbursement payments of $900,000, which it calls "Direct Budget expenditures," meant to pay "vendors, equipment, and out of pocket expenses associated with Snake Nation's teambuilding activities with the Billis needed to facilitate the [c]ampaign."  (Compl. ¶¶ 20–21.)

On December 21, 2018, Snake Nation and PPG executed the Amended Statement of Work relating to the Burkina Faso pilot project.  (Compl. ¶ 26; Amend. SOW No. 3.)  The Amended Statement of Work states that the parties agreed to the amendment "in order to distinguish between consulting fees due [to Snake Nation] for services and expenditures funded by operations budget (hereafter 'direct budget'), to modify the scope of services therein described, and to identify direct budget allocations driven by the scope of services."  (Amend.

SOW No. 3 at 2.)  The agreement also states that as of December 21, 2018, PPG had paid Snake

Nation $1,280,330 and owed Snake Nation $724,737 in consulting fees.  (*Id*.)

The Amended Statement of Work further provided that PPG would advance $503,410.29

to Snake Nation for the "direct budget" expenses.  (*Id*.)  "The Advance captured the full amount

of Snake Nation's anticipated Direct Budget expenditures through the end of the Campaign, and

was to function like a retainer.  Snake Nation would pay vendors using the Advance, and was to

submit invoices for Direct Budget expenditures to PPFA for approval.  Approved invoices would

be credited against the Advance, and Snake Nation was to remit any unused portion of the

Advance to Planned Parenthood at the end of the MSA."  (Compl. ¶ 28.)  Snake Nation

submitted invoices of $134,219 and $340,514 for its "direct budget" expenses in December 2018

and January 2019, respectively.  (Compl. ¶ 32.)

Despite the Amended Statement of Work and the December 2018 and January 2019

invoices, neither PPG nor PPFA paid Snake Nation any portion of the $503,410.29 advance

contemplated under the Amended Statement of Work.  (Compl. ¶¶ 30, 39.)  On January 24, 2019,

Snake Nation informed Defendants that it could not pay various of its "business partners" in

Burkina Faso.  (*Id*. ¶ 49.)  Responding to Snake Nation's inquiry about the advance and the

invoices, a PPFA employee told Snake Nation in a January 25, 2019 email that PPFA was

"reviewing concerns that were brought to [its] attention related to the performance of Snake

Nation's work."[2]  (*Id*. ¶ 33.)  "PPFA's creative team had approved the work that resulted" in the

invoices for December 2018 and January 2019.  (Compl. ¶ 36.)  "[W]eeks" after the January 25

email, PPFA informed Snake Nation that it was continuing its review of the social media

---

[2] The complaint does not make clear if the inquiry about the advance and budget was part of the January 24
communication regarding the business partners in Burkina Faso.  (*Compare* Compl. ¶ 33, *with id*. ¶ 49.).

company's work.  (*Id*. ¶ 43.)  On February 13, 2019, Snake Nation submitted an invoice with an additional $130,954.51 of "direct budget" expenses.  (*Id*. ¶ 44.)

PPFA terminated the MSA with Snake Nation on February 14, 2019.  (Compl. ¶ 45.) PPFA did not notify Snake Nation of the results of its review of its work even though "over a month remained" for the parties to work to resolve the dispute "under the MSA's 'good faith' billing dispute resolution provision."  (*Id*.; *see* MSA ¶ 3.c ("[T]he parties agree to work in good faith to resolve any billing disputes within 60 days after [Planned Parenthood] Client notifies Consultant [Snake Nation] of the disputed charge.")  The same day that PPFA terminated the MSA, Snake Nation informed Defendants of "'disturbing reports from our team in Burkina Faso that PPG is seeking to have meetings with the Billis directly and in circumvent and undermine [*sic*] Snake Nation.'"  (Compl. ¶ 50.)

In advance of a February 26, 2019 meeting at a Burkina Faso hotel between the Billis and Defendants, "Planned Parenthood contacted the Billis in advance via WhatsApp message, informing them that Planned Parenthood was ending its relationship with Snake Nation, and promising them compensation for their continued work on the Campaign."  (*Id*. ¶ 52.)  At the meeting, the representatives of Defendants told members of the Billis that they would pay them a "bonus"—in fact, the amount that Snake Nation had already agreed to pay the Billis—in exchange for agreeing to work exclusively with Defendants.  (*Id*. ¶ 54–55.)  The representatives "informed the Billis and that they would have to seek payment from Snake Nation for their February and March 2019 salaries on the Campaign," even though that representation was allegedly false.  (*Id*. ¶ 55–56.)  As a result, "Snake Nation's field managers and regional managers were placed in danger and Snake Nation's business reputation was tarnished."  (*Id*. ¶ 57.)  "Burkina Faso still employs debtor's prison, and by making the false assertion that Snake

Nation was responsible for or withholding salaries owed to the Billis, Planned Parenthood made Snake Nation and its employees targets. . . . Snake Nation had to extract its team from Burkina Faso for fear of retribution" and a Snake Nation employee "ended up being jailed." (*Id*. ¶ 58.)

Apart from Defendants' alleged misrepresentations, Defendants also "selectively paid certain vendors involved in the Campaign without compensating others, which further created the false impression in Burkina Faso that Snake Nation was a company that did not pay its business partners, or favored certain partners over others." (Compl. ¶ 59.) As a result of Defendants' actions, Snake Nation is now unable to operate in Burkina Faso, that it had to substantially downsize its company, and that it could not pay various vendors. (*Id*. ¶¶ 60–62.) Defendants' actions have substantially impinged Snake Nation's ability to operate its other ventures. (*Id*. ¶¶ 63–65.)

## II.    <u>Procedural History</u>

Snake Nation filed the complaint against PPG and PPFA on October 28, 2022. (*See* Compl.) It asserts six claims for relief: (1) breach of contract against PPG and PPFA, (*id*. ¶¶ 66–79), the First Cause of Action; (2) in the alternative, breach of the implied covenant of good faith against PPG and PPFA, (*id*. ¶¶ 80–88), the Second Cause of Action; (3) unjust enrichment against PPFA to the extent it is not deemed a party of the MSA, (*id*. ¶¶ 89–95), the Third Cause of Action; (4) injurious falsehoods against PPG and PPFA, (*id*. ¶¶ 96–102), the Fourth Cause of Action; (5) tortious interference against PPG and PPFA, (*id*. ¶¶ 103–16), the Fifth Cause of Action; and (6) unfair competition against PPG and PPFA, (*id*. ¶¶ 117–125), the Sixth Cause of Action. Plaintiff seeks damages that "well-exceed $1 million." (*Id*. ¶ 5; *id*. at 23.)

On December 9, 2022 Defendants filed the instant motion to dismiss. (Doc. 10.) In support, Defendants filed a memorandum of law, (Doc. 12 ("Mem.")), the Master Services

Agreement, (Doc. 11-1), Statement of Work No. 3, (Doc. 11-2), and Amended Statement of

Work, (Doc. 11-3). Plaintiff filed its opposition on January 6, 2023. (Doc. 15 ("Opp'n").)

Defendants filed their reply on January 18, 2023. (Doc. 16 ("Reply").) The parties have

engaged in limited discovery relating to the breach-of-contract claim against PPG pending my

resolution of this motion. (*See* Doc. 35; Doc. 45.)

### III.    Legal Standard

Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(b)(6). "A

motion to dismiss is designed to test the legal sufficiency of the complaint." *De Jesus v. Sears,*

*Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996) (internal quotation marks omitted). To survive a

motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to

relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The

court takes the well-pled facts in the complaint as true, draws all reasonable inferences in the

plaintiff's favor, and ignores any "legal conclusions" among the factual allegations. *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is proper when "the allegations in a complaint,

however true, could not raise a claim of entitlement to relief" as a matter of law. *Twombly*, 550

U.S. at 558. When, as here, a defendant asserts a statute-of-limitations defense in a 12(b)(6)

motion, dismissal is proper "if the defense appears on the face of the complaint." *Merryman v.*

*J.P. Morgan Chase Bank, N.A.*, 319 F.R.D. 468, 470 (S.D.N.Y. 2017) (internal quotation marks

omitted).

A complaint is "deemed to include any written instrument attached to it as an exhibit or

any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*,

282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

IV.    **Discussion**

A.    ***Breach of Contract Against PPFA***

Plaintiff's First Cause of Action asserts a claim for breach of contract against both PPG and its corporate parent PPFA, even though only PPG is a signatory to the contract at issue. (MSA at 2, 9; Compl. ¶¶ 66–79.)  Defendants do not move to dismiss Plaintiff's breach-of-contract claim against PPG, (Mem. at 1), but seek dismissal of this claim against PPFA, arguing that as a non-signatory of the MSA, PPFA is not a party to it, and cannot be held liable for the alleged breach of its subsidiary PPG.  (*Id.* at 4–6.)

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks omitted).  New York recognizes exceptions to this general rule.  One is that "[a] non-signatory parent corporation can . . . be held liable if its 'conduct manifests an intent to be bound by the contract.'" *Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 71 (S.D.N.Y. 2019) (quoting *Horsehead Indus., Inc. v. Metallgesellschaft AG*, 657 N.Y.S.2d 632, 633 (1st Dep't 1997)); *cf. Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Pub. Co.*, 281 N.E.2d 142, 143 (1972) (explaining that a "parent company's officers and employees so controlled the actions of their subsidiaries . . . that unitary liability to the plaintiff . . . could be imposed on both corporations").[3]  Courts may infer such intent "from,"

---

[3] Additionally, a parent may be liable under a veil-piercing theory or under an agency theory.  *See, e.g.*, *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 n.13 (S.D.N.Y. 2010) (explaining that a veil-piercing or alter-ego theory is "that the parent fraudulently induced the subsidiary to incur the obligation," while an agency theory "is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf-that is, in the name of the parent" (quoting *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F.Supp. 407, 412 (S.D.N.Y. 1996)); *Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 284–85 (S.D.N.Y. 2023) (discussing the various theories).  However, corporate liability under the theories of veil-piercing, agency and intent to be bound are treated as independent theories under New York law relating to whether a parent corporation can be held liable for the acts of its subsidiary.  *See Spagnola*, 264 F.R.D. at 89 n.13 ("To hold a corporate parent liable for the acts of its subsidiary [under an agency theory] is 'materially different from recovering from a parent by disregarding the corporate form under a veil piercing analysis.'" (quoting *Maung Ng We v. Merrill Lynch & Co., Inc.*, No. 99-CV-9687, 2000 WL 1159835, at *3

*inter alia*, "the parent's participation in the negotiation of the contract." *MBIA Ins. Corp. v. Royal Bank of Canada*, 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) (quoting *Horsehead*, 657 N.Y.S.2d at 633). The "totality of a party's expressed words and deeds" are relevant to the inquiry. *Id*. (internal quotation marks omitted). Courts have inferred an intent for a parent to be bound by a subsidiary's contract when officers or employees of the parent exercised "watch and control" over the subsidiary in negotiating the contract and reviewing the plaintiff's performance of its contractual obligations to the subsidiary. *Jennings*, 367 F. Supp. 3d at 72 (citing *SHLD, LLC v. Hall*, 15-CV-6225, 2016 WL 659109, at \*8 (S.D.N.Y. Feb. 17, 2016)); *TransformaCon, Inc. v. Vista Equity Partners, Inc.*, No. 15-CV-3371, 2015 WL 4461769, at \*5 (S.D.N.Y. July 21, 2015)); *accord Kitchen Winners NY Inc. v. Rock Fintek LLC*, 668 F. Supp. 3d 263, 285 (S.D.N.Y. 2023). Relatedly, courts also recognize a non-signatory parent's intent to be bound if it "has assumed the obligations of the contract," *Jennings*, 367 F. Supp. 3d at 71 (internal quotation marks omitted).

Here, PPFA's conduct manifested an intent to be bound by the Master Services Agreement between PPG and Snake Nation and the Statements of Work incorporated into the MSA. The Complaint alleges that Snake Nation began working on the Billis campaign "at PPFA's invitation" rather than PPG's. (Compl. ¶ 15.) Although the MSA and Statement of Work No. 3 identified only PPG and Snake Nation as parties to the agreements, Plaintiff alleges that Melvin Galloway, an officer of PPFA, signed Statement of Work No. 3. (*Id*. ¶ 22.; *see* SOW No. 3 at 4.) The Amended Statement of Work states that Snake Nation should email progress reports to three PPFA employees—Hillary Castillo, Irene Valdes-Wichinger, and Daisy Turo—at their

---

(S.D.N.Y. Aug. 15, 2000)); *Kitchen Winners*, 668 F. Supp. 3d at 284–85 (distinguishing between alter-ego/veil-piercing theory and intent-to-be-bound theory).

"@PPFA.org" email addresses, (Amend. SOW No. 3 §§ 3.a.i., 3.c.i, 3.d.iv.), and was to meet

monthly with two other PPFA employees—Karl Carter and Mandla Mapondera—also identified

by "@PPFA.org" email addresses, (*id*. § 3.d.ix.C.).  Additionally, Plaintiff received contractual

payments from PPFA, not PPG.  (Compl. ¶ 23.)  Snake Nation's allegations suggest that

throughout the Billis campaign, PPG and PPFA operated as interchangeable entities.  The

common management and employment structures of PPFA and PPG makes it hard to tell where

one ends and the other begins.  *Cf. Jennings*, 367 F. Supp. 3d at 72 (*citing SHLD*, 2016 WL

659109, at *8) ("finding a manifest intent to be bound where the parent company's ownership

and management—which was common with the subsidiary—used the parent entity to negotiate a

contract with the plaintiffs").  The fact that the Amended Statement of Work assigned to PPFA

employees the task of reviewing Snake Nation's work, and that PPFA, rather than PPG, made the

contractual payments, further demonstrate that PPFA exercised the "watch and control" over

PPG necessary for Snake Nation to show that PPFA's conduct manifested an intent to be bound

by the agreements at issue.  *Id*. (citation omitted).

       Thus, Defendants assertion that "PPFA performed a purely administrative role" is belied

by Plaintiff's allegations.  (Mem. at 3.)  Based on the allegations in the complaint, PPFA played a

central role in overseeing Snake Nation's performance under the contract.  After Snake Nation

asked about receiving payment for the invoices it submitted, the email it received stated that

"PPFA is reviewing concerns that were brought to our attention related to the performance of

Snake Nation's work."  (Compl. ¶ 33.)  Taking this allegation as true, PPFA arguably had the

authority to decide, or at least was involved in deciding, when Snake Nation was not performing

its contractual obligations under the MSA.  Such substantive authority can hardly be

characterized as a "purely administrative role."

Defendants cite *Morris v. New York State Dep't of Tax'n & Fin.*, 623 N.E.2d 1157, 1161 (1993) for the proposition that "domination, standing alone, is not enough" to impose a subsidiary's contractual obligations on a parent under a veil-piercing theory, and that Plaintiff has not met its obligation to "establish that the [parent], through [its] domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against [the plaintiff]."  (Reply at 4; *see also* Mem. at 5–6.)  This misconstrues Plaintiff's argument and the theory on which it seeks to hold PPFA liable.  The intent-based theory that Plaintiff invokes, (*see* Opp'n at 7–8), is distinct from the veil-piercing theory, which is interchangeably referred to as the alter-ego theory.  *MBIA*, 706 F. Supp. 2d at 397–98; *see also Brown Bros. Elec. Contractors v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977) (examining the "objective manifestations of the intent of the parties" to determine whether a parent was bound by a subsidiary's contract); *Kitchen Winners*, 668 F. Supp. 3d at 284 (explaining that veil piercing "allow[s] suit against a non-party parent as an alter ego of a signatory").  A plaintiff invoking the veil-piercing or alter-ego theory "does not dispute that the underlying obligation belongs to the corporate subsidiary; however, he seeks to hold the parent liable on the theory that the parent fraudulently induced the subsidiary to incur the obligation."  *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 89 n.13 (S.D.N.Y. 2010) (quoting *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 412 (S.D.N.Y. 1996)).  The logic behind the intent theory, on the other hand, is that "an enforceable contract exists where a party's 'overall conduct reflects its intent to be bound,' even where the party did not sign the offer."  *Kitchen Winners*, 668 F. Supp. 3d at 285 (quoting *Volt Elec. NYC Corp. v. A.M.E., Inc.*, 586 F. Supp. 3d 262, 271 n.6 (S.D.N.Y. 2022)).  In other words, because the complaint plausibly alleges that PPFA's conduct manifested an intent to be bound by the MSA, Plaintiff need not additionally allege that PPFA's "domination was used to commit a

fraud or wrong." *Kitchen Winners*, 668 F. Supp. 3d at 284–85 (internal quotation marks omitted). Thus, Defendants' veil-piercing argument is misplaced and does not warrant dismissal. Defendants' other arguments are unpersuasive, and do not address PPFA's substantial involvement in the Billis campaign and oversight of the drafting of the MSA and Snake Nation's performance of its obligations under the MSA.

I therefore conclude that Plaintiff has plausibly alleged PPFA's liability for breach of contract, and Defendants' motion to dismiss this claim as to PPFA is DENIED.

## B.    *Breach of the Implied Covenant*

Plaintiff's second claim is for breach of the covenant of good faith and fair dealing that New York law implies to exist among the parties to every contract. *See JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08-CV-9116, 2009 WL 321222, at *4 (S.D.N.Y. Feb. 9, 2009) (citing *M/A–Com Security Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir. 1990)). A party to a contract breaches the implied covenant when its "acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties." *JPMorgan*, 2009 WL 321222, at *4 (quoting *Galesi*, 904 F.2d at 136). Under New York law, an implied-covenant claim cannot be based on an action that breaches the express terms of a contract. *See id*. at *5 (citing *Fasolino Foods Co. v. Banca Nazionale del Lavoro*, 961 F.2d 1052, 1056 (2d Cir. 1992). "Consequently, a claim for breach of the implied covenant of good faith can survive a motion to dismiss only if it is based on allegations different from those underlying the accompanying breach of contract claim." *Grand Heritage Mgmt., LLC v. Murphy*, No. 06-CV-5977, 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 5, 2007) (internal quotation marks omitted).

Defendants move to dismiss Plaintiff's claim first on the ground that the complaint pleads the same factual bases for the contract claim and the implied-covenant claim.  (Mem. at 6–8.)  In response, Plaintiff clarifies that its claim is that Defendants breached the implied covenant by (1) depriving Plaintiff of the promised advance payments for the "direct budget," and (2) by "terminating the MSA in a manner that deprived Snake Nation of the right to continue its working relationship with the Billis and the right to have an opportunity of any properly notice [*sic*] billing dispute."  (Opp'n at 11–12; *see* Compl. ¶¶ 85–87.)  Although Plaintiff lumps the billing dispute and the Billis together in one portion of their brief, they later discuss the Billis as a separate subclaim.  (Opp'n at 12–13.)  I thus interpret the complaint to raise three theories of liability pertaining to:  (1) the advance, (2) the good faith billing dispute resolution, and (3) the relationship with the Billis.

Viewed in this light, Plaintiff's theories pertaining to the advance and billing dispute must be dismissed, as they are based on the same factual predicates underlying the contract claim.  To support its contract claim, Plaintiff claims Defendants "never paid the Advance," (Compl. ¶ 73), and "did not comply with the MSA's good faith negotiation provision for resolving billing disputes," (*id*. ¶ 76).  To support its implied-covenant theory based on the advance, Plaintiff pleads that Defendants "withheld payment of the Advance," (*id*. ¶ 86), and that "[a]fter the billing dispute arose . . . [Defendants] refused to work with Snake Nation in good faith" to resolve the dispute, (*id*. ¶ 87).  These allegations are plainly the same, and are clearly rooted in the terms of the MSA, SOW and Amended Statement of Work.  Because a plaintiff must "base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims," Defendants' motion to dismiss the implied-covenant claim with respect to these two theories is GRANTED.

Plaintiff's implied-covenant theory relating to the Billis is another matter.  Neither the word "Billis" nor the concept appear in the factual allegations supporting the contract claim. (Compl. ¶¶ 66–79.)  Plaintiff's theory that Defendants breached the implied covenant in its dealings with the Billis by "communicat[ing] with the Billis without Snake Nation's input" and by "provid[ing] the Billis with false information," (Compl. ¶ 85), does not refer to any express term of the contract, and does not mirror the contract claim as do the other theories.  Dismissal is therefore not warranted on these grounds.

Defendants also argue that Plaintiff's implied-covenant theory as to the Billis "create[s] independent obligations beyond the contract."  (Mem. at 8 (quoting *ARI and Co., Inc. v. Regent Int'l Corp.*, 273 F. Supp. 2d 518, 523 (S.D.N.Y. 2003)).)  In response, Plaintiff argues that from Defendants' awareness that "Snake Nation would be contracting with the Billis" and from the "express terms governing Snake Nation's engagement of the Billis," it is reasonable to infer that "the parties contemplated that Snake Nation would be entitled to benefit from the training and relationship it built with the Billis as part of its work on the Campaign."  (Opp'n at 12.)

I conclude that Plaintiff's allegations do not support an implied-covenant claim related to the Billis.  It is true that the parties contemplated that Plaintiff would execute Statement of Work No. 3 by, among other things, "recruiting and training 'Billies.'"  (SOW No. 3 at 2.)  It is also true that Plaintiff alleges that Defendants told members of the Billis during the February 26, 2019 meeting that they "would work exclusively with Planned Parenthood."  (Compl. ¶ 54.) Defendants' February 26 communication would thus seem to breach the implied covenant by "subvert[ing] the contract itself."  *JPMorgan*, 2009 WL 321222, at *5 (quoting *Butvin v. DoubleClick, Inc.*, No. 99-CV-4727, 2001 WL 228121, at *8 (S.D.N.Y. Mar. 7, 2001).  However, these actions took place after Defendants "terminated" the contract on February 14, 2019.

(Compl. ¶ 45.)  After that date, there was no longer a contract from which a covenant could be implied.  *Cf. Equinox F&B, Inc. v. Roots Pressed Juices LLC*, No. 22-CV-681, 2024 WL 2240230, at *10 (S.D.N.Y. May 17, 2024) (quoting *Harris v. Reagan*, 199 N.Y.S.3d 264, 268 (3d Dep't 2023)) (alteration adopted) ("A party's rights and obligations under an agreement typically cease after its termination.").  Plaintiff does not allege that Defendants took any other action with respect to the Billis aside from the termination of the contract itself, which cannot alone support an implied-covenant claim, and actions after that termination.  *See Wu v. JP Morgan Chase Bank, N.A.*, 2024 WL 732116, at *3 (S.D.N.Y. Feb. 22, 2024) ("[T]he implied covenant does not nullify express terms of the contract or otherwise create independent contractual rights.").  (*See also* MSA § 9.a. (permitting Planned Parenthood to "terminate this MSA at any time.")  Thus, because Plaintiff fails to plausibly allege an implied-covenant claim as to the Billis, Defendants' motion to dismiss this claim is GRANTED.

### C.    *Unjust Enrichment*

Defendants argue that Plaintiff's unjust enrichment claim—asserted against PPFA only—must be dismissed because (1) it is time-barred and (2) it is based on the same facts as the breach of contract claim.  I address each contention separately.

### 1.  Statute of Limitations

According to Defendants, a three-year statute of limitations applies to unjust enrichment claims under New York law that seek money damages.  (Mem. at 14.)  Plaintiff argues that a six-year limitations period applies to its action.  (Opp'n at 15–16.)  I conclude that a six-year limitations period applies to Plaintiff's unjust enrichment claim.

There is no statutory limitations period that applies specifically to unjust enrichment actions under New York law.  *Maya NY, LLC v. Hagler*, 965 N.Y.S.2d 475, 477 (1st Dep't 2013);

*see also City of Almaty v. Sater*, 503 F. Supp. 3d 51, 64 (S.D.N.Y. 2020) ("The New York Civil

Practice Law and Rules do not define a limitations period for unjust enrichment.").  Additionally,

there is no binding authority of either the New York Court of Appeals or the Second Circuit on

this question.  *See City of Almaty*, 503 F. Supp. 3d at 64.  Instead, courts look to two other

statutory limitations periods:  (1) Section 214 of the New York Civil Practice Law and Rules,

which imposes a three-year limitations period on "suits including 'an action to recover a chattel

or damages for the taking or detaining of a chattel' and 'an action to recover damages for an

injury to property,'" *City of Almaty*, 503 F. Supp. 3d at 64 (quoting N.Y. C.P.L.R. § 214(3)–(4)),

and (2) Section 213, which imposes a six-year limitations period on "an action upon a

contractual obligation or liability, express or implied," and "an action for which no limitation is

specifically prescribed by law," *id.* (quoting N.Y. C.P.L.R. § 213(1)–(2)).

There is general agreement among courts in this District that, depending on the type of

unjust enrichment claim that is pled, either the three-year or six-year limitations period of

Section 214 and 213, respectively, may apply.  However, courts disagree on which features of a

claim cause a three- or six-year limitations period to attach.  Defendants rely on the approach

that assigns a limitations period depending on the remedy the plaintiff seeks, applying the three-

year limitations period to unjust-enrichment claims seeking monetary damages, and the six-year

limitations period to claims seeking equitable relief.  *See Iowa Pub. Employees' Ret. Sys. v.*

*Merrill Lynch, Pierce, Fenner & Smith Inc.*, 340 F. Supp. 3d 285, 333 (S.D.N.Y. 2018) (citing

*Matana v. Merkin*, 957 F. Supp. 2d 473, 494 (S.D.N.Y. 2013)); *Shak v. JPMorgan Chase & Co.*,

156 F. Supp. 3d 462, 479 (S.D.N.Y. 2016).  These cases are consistent with the practice of the

Second Department of the New York Appellate Division.  *City of Almaty*, 503 F. Supp. 3d at 65

(citing *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (2d Dep't 2007); *Lambert v. Sklar*, 817

N.Y.S.2d 378, 380 (2d Dep't 2006); *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (2d Dep't 1993)).

Plaintiff relies on the approach which, by contrast, assigns a limitations period depending on the nature of the plaintiff's unjust enrichment claim, such that the six-year limitations period applies to "a claim for unjust enrichment [which] rests on facts that also support another claim governed by a six-year statute of limitations, even when the plaintiff seeks damages." *City of Almaty*, 503 F. Supp. 3d at 65 (citing *Deutsche Bank, AG v. Vik*, 40 N.Y.S.3d 23, 24–25 (1st Dep't 2016); *Maya NY*, 965 N.Y.S.2d at 477; *Knobel v. Shaw*, 936 N.Y.S.2d 2, 6 (1st Dep't 2011)). The First Department of the New York Appellate Division follows this approach, *see id.*, and Plaintiff argues that it should govern here because that department "encompasses the county where Defendants are located," (Opp'n at 16).

I find that the six-year limitations period applies to Plaintiff's unjust enrichment claim. Consider that Plaintiff characterizes this claim as "based on a theory of an implied in law contract." (Opp'n at 16.) Plaintiff's characterization is sound as a matter of New York law, under which, as discussed, "the theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement." *Elavon, Inc. v. Ne. Advance Techs., Inc.*, No. 15-CV-7985, 2017 WL 4876300, at *9 (S.D.N.Y. Oct. 27, 2017) (quoting *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, Inc.*, 448 F.3d 573, 586–87 (2d Cir. 2006); *Goldman v. Met. Life Ins. Co.*, 841 N.E.2d 742, 746 (N.Y. 2005). The nature of Plaintiff's claim thus mirrors the language of Section 213, which assigns a six-year limitations period for "an action upon a contractual obligation or liability, express or implied." N.Y. C.P.L.R. § 213(2); *see City of New York v. Davis*, 7 F.2d 566, 573 (2d Cir. 1925) ("Contracts implied in law, or more properly quasi or constructive contracts, are a class of obligations which are imposed or created

by law without regard to the assent of the party bound, on the ground that they are dictated by reason and justice." (internal quotation marks omitted)); *see also City of Almaty*, 503 F. Supp. 3d at 65 ("The theory of unjust enrichment lies as a quasi-contract claim and contemplates an obligation imposed by equity to prevent injustice." (quoting *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012)). Following the plain text of Section 213 of the New York Civil Practice Law and Rules, and consistent with the First Department's approach, the six-year limitations period applies to Plaintiff's claim of unjust enrichment against PPFA.

Defendants' citation to the cases in this District which cite the Second Department to impose a three-year limitations period to unjust enrichment claims seeking monetary relief does not disturb this conclusion. In *City of Almaty*, then-District Judge Nathan expressed skepticism of the "cases in this district that simply recite the Second Department's rule without considering the split of authority or the specific provisions of the New York Civil Practice Law and Rules." 503 F. Supp. 3d at 65. Judge Nathan further noted that "New York courts have historically considered both the claim and remedy in determining the applicable statute of limitations." *Id*. (citing *Paver & Wildfoerster v. Catholic High Sch. Ass'n*, 345 N.E.2d 565, 568 (N.Y. 1976)). Consistent with this observation, in *Cooper v. Parsky*, the Second Circuit reversed the dismissal of a fiduciary-duty claim that the district court had determined was time-barred by the three-year limitations period because the plaintiffs sought monetary damages. 140 F.3d 433, 440–41 (2d Cir. 1998). The panel, noting that plaintiffs had alleged that defendants violated obligations memorialized in a prior agreement, reasoned that the claim therefore could "properly be viewed as stating a claim for breach of contract," and that the six-year limitations period applied. *Id*. at 441. This binding precedent favors the First Department's approach to selecting a limitations period based on the nature of the plaintiff's claim. Because Snake Nation's claim for unjust

enrichment is a quasi-contract claim, the six-year limitations period in Section 213(2) of the New York Civil Practice Law and Rules applies.

Defendants' motion to dismiss the unjust enrichment claim based on the statute of limitations is DENIED.

### 2.    Pleading Contractual and Unjust Enrichment Claims

Plaintiff does not dispute that it bases its unjust enrichment claim on the same subject matter as its contract claim against PPFA.  (Opp'n at 14.)  In their motion to dismiss this claim, Defendants point out the rule that "under New York law, a plaintiff may not recover under quasi-contract theories such as unjust enrichment where an enforceable contract governs the same subject matter." *Nantong Sanhai Garment Co. v. Fab Mill Inc.*, No. 21-CV-859, 2022 WL 540756, at *4 (S.D.N.Y. Feb. 23, 2022) (internal quotation marks omitted) (quoting *Amable v. New School*, No. 20-CV-3811, 2021 WL 3173739, at *12 (S.D.N.Y. July 27, 2021)).  However, at the same time, Defendants maintain that PPFA is not a party to the MSA.  *Supra* § IV.A. "Recognizing that Fed. R. Civ. P. 8(d) permits parties to plead in the alternative [], this Court has permitted plaintiffs to raise simultaneous claims for breach of contract and unjust enrichment when either party has raised a question about whether the contract governing the dispute was valid and enforceable." *Lefkowitz v. Reissman*, No. 12-CV-8703, 2014 WL 925410, at *12 (S.D.N.Y. Mar. 7, 2014).  "At the pleading stage, Plaintiff is not required to guess whether it will be successful on its contract, tort, or quasi-contract claims." *Chigirinskiy v. Panchenkova*, No. 14-CV-4410, 2015 WL 1454646, at *18 (S.D.N.Y. Mar. 31, 2015) (internal quotation marks omitted) (quoting *St. John's Univ., New York v. Bolton*, 757 F. Supp. 2d 144, 183 (E.D.N.Y. 2010)).

However, Plaintiff asserts its contract claim against both PPFA and PPG, and Defendants do not contest that there is a binding contract between Plaintiff and PPG.  (*See* Mem. at 1.) Defendants contend that the rule against dual pleading of contract and unjust enrichment claims applies "even if one of the parties to the lawsuit is not a party to the contract."  (Mem. at 11.)  It is true that many courts in this District and of the New York Appellate Division have concluded that "the existence of a valid and binding contract precludes a claim for unjust enrichment even against a third party non-signatory to the agreement."  *Nantong*, 2022 WL 540756, at *4 (internal quotation marks omitted); *see also Ahmed v. Cigna Health Mgmt., Inc.*, No. 23-CV-8094, 2024 WL 3345819, at *6 (S.D.N.Y. July 8, 2024) (citing, *inter alia*, *Bd. of Managers v. Azogui*, 197 N.Y.S.3d 29, 30 (1st Dep't 2023)).  Under this rule, the binding contract between PPG and Snake Nation, which covers the same subject-matter as Snake Nation's contract and unjust-enrichment claims against PPFA, would preclude the unjust-enrichment claim.

In response, Plaintiff points out that there is a split of authority on this point within this District.  (Opp'n at 14–15.)  "[S]ome courts have held that the mere existence of a written contract governing the same subject matter does not preclude recovery in quasi-contract from *non parties* so long as the other requirements for quasi contracts are met."  *Lee v. Kylin Mgmt. LLC*, No. 17-CV-7249, 2019 WL 917097, at *2 (S.D.N.Y. Feb. 25, 2019) (internal quotation marks omitted) (citing *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 754 F. Supp. 37, 40–41 (S.D.N.Y. 1991)[4]; *Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 15-CV-4428, 2018 WL 4278286, at *30–31 (S.D.N.Y. Mar. 26, 2018).  In *Lee v. Kylin Management LLC*, Judge Jesse M. Furman reasoned that in some instances when, as here, a contract governs the subject matter at

---

[4] *Mueller v. Michael Janssen Gallery Pte. Ltd.* stated that *Seiden*'s reasoning "is no longer considered good law" due to subsequent contrary precedent.  225 F. Supp. 3d 201, 207 (S.D.N.Y. 2016).  Judge Furman rejected that conclusion in *Lee*.  2019 WL 917097 ("[T]he Court concludes that [Judge Michael Mukasey's] view [in *Seiden*] is in fact the correct one.").

issue, permitting non-parties to bring quasi-contract claims "is more consistent with precedent from the New York Court of Appeals" and "is more consistent with 'the logic of the equitable doctrine of quantum meruit which is designed to prevent unjust enrichment where the absence of an enforceable contract otherwise prevents recovery from noncontracting parties.'" 2019 WL 917097, at *2–3 (quoting *Seiden*, 754 F. Supp. at 41 and citing, *inter alia*, *Bradkin v. Leverton*, 257 N.E.2d 643 (N.Y. 1970); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009)).

Recently, in *Ahmed v. Cigna Health Management, Inc.*, Judge Arun Subramanian identified two circumstances in which it may be appropriate to permit a party to bring an unjust-enrichment claim against a non-signatory to a contract that governs the subject matter: (1) when "a nonparty to the contract—who was not 'purporting to act by, through, or under the entity that had entered into the contract'—took a benefit that was the subject of the contract without compensating the other party," or (2) in cases "involv[ing the] diversion of funds from the party who breached the contract to the nonparty against whom the unjust-enrichment claim was brought." 2024 WL 3345819, at *7 (quoting *Natura Dev. N.V. v. HEH Advisors LLC*, 2020 WL 550661, at *6 (S.D.N.Y. Feb. 4, 2020) and citing *Lee*, 2019 WL 917097, at *1, *3). Permitting dual pleading in these circumstances makes sense in light of the general principle that "[u]njust enrichment is an equitable claim that is unavailable where an adequate remedy at law exists." *Hua Xue v. Jensen*, No. 19-CV-1761, 2020 WL 6825676, at *13 (S.D.N.Y. Nov. 19, 2020) (quoting *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 400 F. App'x 611, 613 (2d Cir. 2010)); *see also Seiden*, 754 F. Supp. at 41 (permitting alternative dual pleading because the plaintiff alleged "defendants [had] reaped the benefits of its executive search services under circumstances in which it would be unjust for plaintiff not to be fully compensated by defendants

for the value of those services").  There is no adequate remedy at law in the first circumstance because there is "no breach of contract" from which the plaintiff may claim damages.  *Ahmed*, 2024 WL 3345819, at *7 (citing *Bradkin v. Leverton*, 257 N.E.2d 643, 644, 646 (N.Y. 1970)). With regard to the second circumstance, there is no adequate remedy at law because once funds are diverted from a contracting party to a non-contracting party, the plaintiff can no longer collect those funds from the contracting party.  *Cf. Lee*, 2019 WL 917097, at *3 ("After all, if Lee were to prevail on his contract claim against Kylin, he would have no remedy against Kang — even if he could prove that Kang took money knowing it belonged by right to Lee.  And that would be true even if Kylin were insolvent at the time of judgment." (internal quotation marks omitted)).

Although I agree that in some circumstances a plaintiff may plead an unjust enrichment claim against a non-contracting party along with a contract claim against a contracting party, Plaintiff has not demonstrated that this case presents such a circumstance.  The first circumstance discussed in *Ahmed* does not apply because Plaintiff alleges that PPFA acted "by" and "through" PPG, and there is no dispute that Plaintiff states a breach-of-contract claim against PPG.  *See* 2024 WL 3345819, at *7; *see supra* § IV.A.  The second circumstance does not apply, because Plaintiff does not allege that PPFA diverted funds from PPG, *see Ahmed*, 2024 WL 3345819, at *7; *Lee*, 2019 WL 917097, at *3, rather, it simply alleges that "[b]oth PPFA and PPG are parties to the MSA," (Compl. ¶ 68).  In other words, Plaintiff has not alleged any facts to suggest that a recovery at law against PPG alone would be inadequate, for instance because PPFA siphoned Snake Nation's money from PPG, *see Lee*, 2019 WL 917097, at *3, or that it would otherwise "be unjust for plaintiff not to be fully compensated by" PPFA as opposed to PPG, *Seiden*, 754 F. Supp. at 41.

Given the existence of a binding contract between Plaintiff and PPG pertaining to the same subject matter as Plaintiff's unjust-enrichment claim against PPFA, and without any allegations to indicate recovery against only PPG is not an adequate remedy at law, Defendants' motion to dismiss this claim is GRANTED.

### D.    *Injurious Falsehood*

Defendants seek to dismiss Plaintiff's claim for injurious falsehood, arguing that Plaintiff's claims are legally deficient and that they are time-barred.

### 1.  Pleading Injurious Falsehood

Defendants first argue that Plaintiff did not plead the special damages required to state an injurious falsehood claim under New York law.  (Mem. at 15–16.)  *See Kasada, Inc. v. Access Cap., Inc.*, No. 01-CV-8893, 2004 WL 2903776, at *16 (S.D.N.Y. Dec. 14, 2004) ("The requirement of pleading and proving special damages [to state an injurious-falsehood claim] is applied strictly.").  In response, Plaintiff characterizes its claim as a "business disparagement tort" for which it need not plead special damages.  (Opp'n at 23.)

The New York Court of Appeals, "although not using the 'business disparagement' label, has recognized a cause of action for" defamation in the business context.  *Cubby, Inc. v. CompuServe, Inc.*, 776 F. Supp. 135, 141 (S.D.N.Y. 1991) (citing *Ruder & Finn Inc. v. Seaboard Surety Co.*, 422 N.E.2d 518, 522 (N.Y. 1981)).  Specifically, the Court explained:

> Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed.  Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement, but will do so only if malice and special damages are proven.

*Ruder & Finn*, 422 N.E.2d at 522 (citations omitted).

"Under New York law, to state a claim for defamation, a plaintiff must allege '(1) a written or spoken defamatory statement of and concerning the plaintiff, (2) publication to a third party, (3) fault, (4) falsity of the defamatory statement, and (5) special damages or per se actionability.'"  *Moleon v. Alston*, No. 21-CV-1398, 2021 WL 5772439, at *14 (S.D.N.Y. Dec. 3, 2021) (quoting *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)).  Statements "that tend to injure another in his or her trade, business or profession" is actionable as defamation per se. *Accurate Grading Quality Assurance, Inc. v. Khothari*, No. 12-CV-9130, 2014 WL 5073576, at *13 (S.D.N.Y. Sept. 30, 2014) (quoting *Epifani v. Johnson*, 882 N.Y.S.2d 234 (2d Dep't 2009)). Defendants do not argue that Plaintiff cannot proceed on this theory of liability.  (*See* Reply at 9.)

For a plaintiff's defamation claim to survive a motion to dismiss, the complaint must identify "the purported communication, and indicate[] who made the statement, when it was made, and to whom it was communicated."  *Moleon*, 2021 WL 5772439, at *15 (internal quotation marks omitted).  Defendants argue on reply that Plaintiff's claim is not pled with enough specificity.  (Reply at 9.)  Plaintiff alleges that on February 26, 2019, representatives of Defendants—Daisy Tuzo and Safiatou Sali Some—met with members of the Billis at a Burkina Faso hotel and falsely told them "that they would have to seek payment from Snake Nation for their February and March 2019 salaries on the Campaign," creating "the misleading impression that Snake Nation was willfully withholding the Billis' pay."  (Compl. ¶¶ 55–56.)  These allegations are specific enough to survive a motion to dismiss because they "identify to whom, when, and where" the specific, allegedly false statement was made.  *Moleon*, 2021 WL 5772439, at *16 (citation omitted).[5]

---

[5] Defendants do not argue that this statement was not defamatory because it was not susceptible to a defamatory meaning. *See Van Buskirk v. New York Times Co.*, 325 F.3d 87, 90 (2d Cir. 2003) ("A defamatory meaning is one that exposes an individual to public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion,

Plaintiff also bases its defamation claim on Defendants' "fail[ure] to compensate certain vendors that worked on the Campaign despite promising to do so."  (Compl. ¶ 99.)  This allegation cannot support a defamation claim because it is not a "false statement."  *Moleon*, 2021 WL 5772439, at \*14 (quoting *Foster v. Churchill*, 665 N.E.2d 153, 157 (N.Y. 1996)).  Even if I assume from the allegations in the complaint that Plaintiff bases this claim on "representations" to "certain vendors" that Snake Nation was responsible for paying them, (Compl. ¶¶ 99–100), the allegations could not survive a motion to dismiss because they do not identify "the time and manner in which [the statements] were made."  *Moleon*, 2021 WL 5772439, at \*16 (internal quotation marks omitted).  Thus, to the extent Plaintiff's cause of action is based on these nonspecific allegations, they are dismissed.

### 2.  Statute of Limitations

Defendants argue that Plaintiff's claim is time-barred by the one-year statute of limitations that applies to injurious falsehood claims—more accurately, defamation claims— under New York law.  *See* N.Y. C.P.L.R. § 215(3); *LoanStreet, Inc. v. Troia*, No. 21-CV-6166, 2022 WL 3544170, at \*4 (S.D.N.Y. Aug. 17, 2022) ("Defamation claims are subject to a one-year statute of limitations under New York law.").  Plaintiff contends that the one-year bar does not apply because the complaint alleges that Defendants "continued to defame it up through the filing of the Complaint."  (Opp'n at 24; *see* Compl. ¶ 99 ("On information and belief, Planned Parenthood continues to misrepresent the circumstances under which it ended its business relationship with Snake Nation.").)  This "conclusory allegation," made only "upon information and belief," falls far short of plausibly alleging defamation.  *Citizens United v. Schneiderman*,

---

ostracism, degradation, or disgrace, or induces an evil opinion of one in the minds of right-thinking persons, and deprives one of confidence and friendly intercourse in society." (internal quotation marks omitted))

882 F.3d 374, 384 (2d Cir. 2018).  Further, even if I credited Plaintiff's contention, "[u]nder New York law, a cause of action for defamation accrues immediately upon the occurrence of the tortious act and thus, is not appropriate for the continuing violation exception."  *Kamdem-Ouaffo v. Pepsico, Inc.*, 160 F. Supp. 3d 553, 572 (S.D.N.Y. 2016) (internal quotation marks omitted). The only surviving portion of the defamation claim relates to statements made on February 26, 2019, *see supra*, far outside the one-year limitations period of Section 215(3).

Thus, because Plaintiff's claim is time-barred, Defendants' motion to dismiss Fourth Cause of Action it is GRANTED.

### E.   *Tortious Interference*

Plaintiff's claim for tortious interference has two parts:  one "against Defendants, collectively, for interfering with Snake Nation's relationships with the Billis after PPFA terminated the MSA," (*see* Compl. ¶ 109), and one "against PPFA alone . . . for interfering with Snake Nation's MSA with PPG," (*id*. ¶ 110).  (Opp'n at 18.)  Defendants argue that Plaintiff has failed to state a claim based on either theory, and that the claim is untimely.

### 1.   Interference with Business Relations

"To prevail on a claim for tortious interference with business relations . . . a plaintiff must show that '(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship.'"  *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (quoting *Catskill Dev., L.L.C. v. Park Place Ent. Corp.*, 547 F.3d 115, 132 (2d Cir. 2008)).  Defendants challenge Plaintiff's allegations related to the third element—that Defendants' purpose was wrongful or that its means were dishonest,

unfair, or improper.[6]  (Mem. at 17–18.)  To make a showing on this element, the "general rule" is

that a plaintiff must show that "the defendant's conduct [amounted] to a crime or an independent

tort."  *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004).  There is "an exception" to the general

rule "where a defendant engages in conduct for the sole purpose of inflicting intentional harm on

plaintiffs," *id*. (internal quotation marks omitted), but Plaintiff does not rely on this exception

here, (Opp'n at 19).  The defendant's wrongful conduct must be "directed not at the plaintiff

itself, but at the party with which the plaintiff has or seeks to have a relationship."  *Id.* at 192.

Plaintiff instead focuses on its allegations that Defendants "took the Billi work force"

with which Snake Nation had cultivated a relationship.  (*Id*. at 19–20.)  However, Plaintiff does

not explain how this action itself constitutes a crime or tort, nor does it allege that Defendants

took the action for the sole purpose of damaging Snake Nation.  (*Id*.)  Without those allegations,

this theory fails to state a claim for interference with business relations.  *See Carvel*, 3 N.Y.3d at

190; *see also Darby Trading Inc. v. Shell Int'l Trading & Shipping Co.*, 568 F. Supp. 2d 329,

343–47 (S.D.N.Y. 2008) (dismissing claims of tortious interference with business relations for

failure to state a claim).

Next, Plaintiff suggests that Defendants' alleged misrepresentations can support its

tortious interference with business relations claim.  (Opp'n at 20.)  A misrepresentation or false

statement can only support this kind of claim if it "constitute[s] an independent crime or tort,

[was] made solely out of malice, or amount[s] to 'extreme and unfair' economic pressure."

*Friedman v. Coldwater Creek, Inc.*, 551 F. Supp. 2d 164, 170 (S.D.N.Y. 2008), *aff'd,* 321 F.

App'x 58 (2d Cir. 2009).  The misstatement Plaintiff identifies as the basis of this claim is that

---

[6] For the first time on reply, Defendants challenge the Plaintiff's showing on the first element, the business relationship.  (Reply at 7–8.)  I need not, and do not here, consider arguments raised for the first time on reply.  *See, e.g.*, *Bektic–Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012).

Defendants "misrepresented that Snake Nation was willfully withholding the Billis' salaries, while all the while it was PPFA who had assumed ultimate responsibility for their salaries." (Opp'n at 20; *see also* Compl. ¶¶ 55–56.)  As discussed *supra* § IV.D.I, Plaintiff alleges that this statement forms the basis of a separate business tort for defamation.  Plaintiff may thus base a tortious interference with business relations claim on this allegedly tortious misrepresentation.

Finally, Plaintiff argues that Defendants improperly "exert[ed] economic pressure on the Billis" to interfere with the Billis' relationship with Snake Nation.  (Opp'n at 20.)  When a plaintiff pleads economic pressure as the action constituting interference, the "pressure must have been for the 'sole purpose of inflicting intentional harm on plaintiffs.'"  *Catskill*, 547 F.3d at 137 (Sotomayor, J.) (quoting *Carvel*, 3 N.Y.3d at 190).  Plaintiff does not plead that the sole purpose of Defendants' actions in Burkina Faso following the termination of the MSA was to harm Snake Nation.  Plaintiff's economic pressure theory therefore fails.

Plaintiff has plausibly alleged a claim for tortious interference with business relations based on its underlying claim that Defendants' statements at the February 26, 2019 meeting were defamatory.  However, Defendants argue that any claim for business-relations interference is barred by the three-year statute of limitations that applies to such a claim.  (Mem. at 19.)  *See Murphy v. Morlitz*, No. 15-CV-7256, 2017 WL 4221472, at *8 (S.D.N.Y. Sept. 21, 2017), *aff'd*, 751 F. App'x 28 (2d Cir. 2018).  "The claim begins to run when the defendant performs the action (or inaction) that constitutes the alleged interference."  *Id.* (internal quotation marks omitted).  Thus, the business-relations interference claim accrued on February 26, 2019, the date of the allegedly defamatory statement.  Accounting for the 228 days that former Governor Cuomo tolled the limitations periods on all claims with limitations periods set by New York law, *see Doe v. State Univ. of New York Purchase Coll.*, 617 F. Supp. 3d 195, 207–08 (S.D.N.Y. 2022)

(adding 228 days to three-year limitations period), Plaintiff needed to file a tortious interference claim based on the February 26, 2019 statements before October 12, 2022.  Plaintiff filed its complaint on October 28, 2022, after the limitations period elapsed.  (Doc. 1.)  The action is therefore time-barred.

Plaintiff notes that it alleged "up through the filing of this Complaint, Planned Parenthood has continued to require the Billis to work with it exclusively and to misrepresent the circumstances under which it ended its business relationship with Snake Nation."  (Compl. ¶ 61; *see also id*. at ¶ 108.)  These allegations do not save Snake Nation's claim, because a plaintiff cannot "rely on [] vague and conclusory assertions to reset the clock on the applicable statutes of limitations."  *Verschleiser v. Frydman*, No. 22-CV-7909, 2023 WL 5835031, at *10 (S.D.N.Y. Sept. 7, 2023); *see id.* at *9 (dismissing tortious interference with prospective business relations claim because "the only specific allegations pertaining to [the] claim" occurred more than three years before the filing of the complaint).

Because the limitations period has run on this claim, the motion to dismiss the Fifth Cause of Action construed as a tortious-interference-with-business-relations is GRANTED.

## 2.  Tortious Interference with Contract

"In order to state a tortious interference with contract claim under New York law, a plaintiff must demonstrate the existence of a valid contract, the defendant's knowledge of the contract's existence, that the defendant intentionally procured a contract breach, and the resulting damages to the plaintiff."  *Ithaca Cap. Invs. I S.A. v. Trump Panama Hotel Mgmt. LLC*, 450 F. Supp. 3d 358, 372 (S.D.N.Y. 2020) (citing *Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt., L.L.C.*, 455 Fed. App'x 102, 104 (2d Cir. 2012)).  Plaintiff's claim is that— assuming PPFA is not a party to the MSA between PPG and Snake Nation—PPFA

"manufactured pretextual grounds" for PPG to terminate the MSA because PPFA wanted to "take on sole ownership of the Campaign." (Compl. ¶¶ 112–14.) Snake Nation alleges that PPFA's actions withheld the "opportunity to address concerns with its work, in violation of Snake Nation's rights," and "prevented [it] from realizing the full benefits of the MSA, including Snake Nation's expectation to be paid for its approved work." (Compl. ¶ 114–15.)

Defendants argue that this claim is time-barred by the applicable three-year limitations period. (Mem. at 19.) *See Murphy*, 2017 WL 4221472, at *8. Actions for tortious interference with contract accrue "when the claim becomes enforceable, *i.e.*, when all elements of the tort can be truthfully alleged in a complaint." *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 225 (S.D.N.Y. 2013) (quoting *Kronos, Inc. v. AVX Corp.*, 612 N.E.2d 289, 292 (N.Y. 1993)). Put another way, "no right exists until there is loss." *Kronos*, 612 N.E.2d at 935. Arguably, Snake Nation suffered its first "loss" from PPFA's alleged interference on January 21, 2019, 30 days after it submitted the December 22, 2018 invoice for $134,219 in direct budget expenses that Defendants did not dispute or pay. (*See* Compl. ¶ 31; MSA § 3.d. ("[PPG] shall pay undisputed charges in full within 30 days after receipt.").) Plaintiff also pleads that the failure of PPFA to pay the direct budget expenses as part of its interference-with-contract claim. (*Id.* ¶ 115.) At the latest, Plaintiff's claim accrued on February 14, 2019, the day Plaintiff alleges Defendants terminated the MSA. (*Id.* ¶ 45.) *Cf. My Mavens, LLC v. Grubhub, Inc.*, No. 20-CV-4657, 2023 WL 5237519, at *24 (S.D.N.Y. Aug. 14, 2023) ("[A] tortious interference claim accrues, at the latest, when a contract is first breached as a result of the defendant's interference."). Either way, these events occurred more than three years and 228 days prior to Plaintiff's filing of this action on October 28, 2022. The tortious-interference-with-contract claim is therefore time-barred.

Plaintiff argues that the action accrued on March 17, 2019—just inside the limitations period—because of the MSA's 60-day period for the parties to resolve billing disputes in good faith that "logically ought to survive termination" under the MSA's severability provision. (Opp'n at 22 (quoting MSA § 13.h.).)  As discussed, even if the good-faith-negotiation provision did survive the termination of the MSA, the termination of the MSA itself is an independent loss and falls outside the limitations period for this claim.  *See My Mavens, LLC*, 2023 WL 5237519, at *24.  Indeed, Plaintiff pleads in its complaint that on the day the MSA was terminated, it lost the ability to "cur[e] any alleged deficiencies" in the invoices it had submitted.  (Compl. ¶ 45.) Therefore, the argument based upon the MSA's 60-day period is unavailing.

Because the limitations period has run on this claim, the motion to dismiss the Fifth Cause of Action construed as a tortious-interference-with-contract claim is GRANTED.

### F. *Unfair Competition*

A plaintiff may state an unfair competition claim under New York law under a "palming off" theory or a "misappropriation" theory.  *Chartwell RX, LLC v. Inmar, Inc.*, 620 F. Supp. 3d 59, 78 (S.D.N.Y. 2022) (internal quotation marks omitted).  The parties agree that Plaintiff's theory is misappropriation.  (Mem. at 20; Opp'n at 17.)  Misappropriation is unfair exploitation of "'the skill, expenditures and labors' of a competitor.'"  *Chartwell*, 620 F. Supp. 3d at 78 (quoting *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 308 (N.Y. 2018)).  "The essence of the misappropriation theory is not just that the defendant has reaped where it has not sown, but that it has done so in an unethical way and thereby neutralized a commercial advantage that the plaintiff achieved through honest labor."  *Id.* (internal quotation marks omitted).

31

Defendants first argue that Plaintiff has not stated a claim for misappropriation, because New York law "specifically requires proof that the defendant took something in which the plaintiff enjoyed a property right." *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 429 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016).  According to Defendants, dismissal is warranted because Plaintiff cannot allege that Plaintiff had a property right in the Billis.  (Mem. at 20.)  However, under New York law, the "property" misappropriated "can be tangible property or merely goodwill." *Fung-Schwartz v. Cerner Corp.*, No. 17-CV-233, 2019 WL 4393022, at *8 (S.D.N.Y. Sept. 13, 2019) (citing *ITC Ltd. v. Punchgini, Inc.*, 9 N.Y.3d 467, 478 (2007).  Plaintiff's claim is that Defendants misappropriated their goodwill with the Billis, (*see* Compl. ¶¶ 119–24), which is sufficient, so Defendants' argument fails.

Defendants next argue that Snake Nation has not pled that it is a "competitor" to PPG or PPFA.  (Mem. at 21.)  "By definition, competition is fundamental to any unfair competition claim.  Where there is no competition, there can be no unfair competition." *EMI Music Mktg. v. Avatar Recs., Inc.*, 317 F. Supp. 2d 412, 423 (S.D.N.Y. 2004); *see also Chartwell*, 620 F. Supp. 3d. at 78–79 (dismissing unfair competition claim because the parties operated in different industries and "[did] not compete with" each other); *Fung-Schwarz*, 2019 WL 4393022, at *8 (dismissing claim because "Plaintiffs [did] not allege how they and Defendants were competitors").

Viewing Snake Nation's allegations in its favor, it has alleged that it was a competitor of PPG and PPFA.  Snake Nation describes itself as a "media company." (Compl. ¶ 14.)  The Complaint does not specifically describe Defendants' business, but it does allege that Defendants "partnered" with Snake Nation on the Billis campaign after a competitive bidding process, (Compl. ¶¶ 17–18), and that following the termination of the MSA, Defendants took over the

operations of the social media campaign, including working directly with the Billis, "promising them compensation for their continued work on the Campaign," (*id*. ¶ 52). From these allegations, it is reasonable to infer at this stage of the litigation that Defendants' business included operating social media campaigns, such that Defendants are, like Plaintiff, a "media company."

Because Plaintiff plausibly alleges a claim for unfair competition, Defendants' motion to dismiss the Sixth Cause of Action for unfair competition is DENIED.

## V.    <u>Conclusion</u>

For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART as to the claims for breach of the implied covenant, unjust enrichment, injurious falsehood, and tortious interference, and DENIED IN PART as to the breach-of-contract and unfair-competition claims.

The Clerk of Court is respectfully directed to terminate the pending motion at Doc. 10.

SO ORDERED.

Dated: January 21, 2025
      New York, New York

                                      Vernon S. Broderick
                                      United States District Judge